Exhibit 15 - 1

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Release No. 99118 / December 7, 2023

Admin. Proc. File No. 3-19185

---

In the Matter of the Application of

SOUTHEAST INVESTMENTS, N.C., INC.

and

FRANK HARMON BLACK

For Review of Disciplinary Action Taken by

FINRA

---

OPINION OF THE COMMISSION

REGISTERED SECURITIES ASSOCIATION — REVIEW OF DISCIPLINARY PROCEEDING

FINRA member firm and its president appeal from FINRA disciplinary action finding that they failed to establish, maintain, and enforce an effective system for the retention of business-related emails, failed to preserve 16 emails in the firm's records, and provided false testimony and fabricated documents to FINRA. *Held*, FINRA's findings of violations and sanctions are *sustained in part*, and the case is *remanded* for further proceedings.

APPEARANCES:

*Alan M. Wolper and Blaine F. Doyle of Ulmer & Berne LLP* for Southeast Investments, N.C., Inc. and Frank Harmon Black.

*Alan Lawhead and Andrew Love* for FINRA.

Appeal filed:  May 29, 2019
Last brief received:  October 22, 2019

**Exhibit 15 - 2**

2

Southeast Investments, N.C., Inc., a North Carolina broker-dealer, and its president Frank Harmon Black seek review of FINRA disciplinary action. FINRA found that, between 2010 and 2015, Southeast and Black ("Applicants") failed to establish and maintain a supervisory system and failed to establish, maintain, and enforce written supervisory procedures that were reasonably designed to preserve business-related electronic correspondence as required by FINRA rules; and that Applicants did not preserve 16 emails in the firm's records as required by the federal securities laws and FINRA rules. FINRA also found that, between 2012 and 2014, Applicants submitted to FINRA false testimony and fabricated documents regarding Applicants' purported inspections of certain Southeast offices from 2010 to 2012.

For the supervisory violation, FINRA fined Applicants $73,000 jointly and severally. For the failure to preserve the 16 emails, FINRA fined Applicants $500 jointly and severally. For providing false testimony and fabricated documents to FINRA, FINRA fined Southeast $73,000 and barred Black from associating with any FINRA member firm in any capacity. For the reasons provided below, we sustain the findings of violations and sanctions imposed for the supervisory violation and the failure to preserve the 16 emails, but we remand this proceeding to FINRA with respect to the alleged provision of false testimony and fabricated documents.

## I.     Background

Black has been in the securities industry since 1971. He formed Southeast in 1997 and has been associated with the firm since then. Southeast has been a FINRA member since 1997.

During the relevant period of 2010 to 2015, Southeast engaged in a general retail securities business with a home office in Charlotte, North Carolina, and had between 114 and 133 registered representatives located throughout the United States. The registered representatives often worked from their residences and were supervised by the home office.

Black is Southeast's President, Chief Executive Officer, Chief Compliance Officer, Chief Financial Officer, Anti-Money Laundering Compliance Officer, Financial Operations Principal, and General Securities Sales Supervisor. He also owned between 95% and 100% of the firm during the relevant period. Pursuant to Southeast's written supervisory procedure ("WSPs") in effect during that period, Black had ultimate supervisory responsibility over Southeast, its WSPs, and its registered representatives. Black was responsible for maintaining and updating Southeast's WSPs, enforcing Southeast's obligations to conduct office inspections, and ensuring retention of Southeast's electronic correspondence.

## A.     Applicants represented to FINRA that they conducted inspections of four registered representatives' offices between October 2010 and July 2012.

FINRA Rule 3110(c) requires firms to inspect their satellite offices. In 2011, our staff examined Southeast and identified deficiencies in these inspections. FINRA subsequently examined the firm in September 2012 to determine if the firm had addressed these deficiencies. During this subsequent examination, FINRA examiners asked Black how he tracked the firm's inspections of its own offices. Black stated that he used a running list on his computer and provided FINRA a document titled "Office Inspections Checklist by Due Date" ("Inspections Calendar"). The Inspections Calendar, which Black created and regularly updated, listed

Exhibit 15 - 3

3

Southeast offices, due dates for internal inspections of those offices, and dates that the inspections were purportedly completed. The Inspections Calendar showed that the firm, through Black, inspected 43 offices between May 2010 and January 2011, including the office of Rocci Ravella on October 1, 2010, Scott Rivard on May 11, 2011, Tom Minor on August 11, 2011, and Tony Marable on July 16, 2012 (collectively, the "Four Representatives").

In April 2013, pursuant to FINRA Rule 8210, FINRA staff requested that Applicants provide evidence of the 43 office inspections reflected on the Inspections Calendar.[1] Black produced Southeast's "Internal Review Files and Forms Checklist," which listed tasks to be conducted as part of each inspection such as "review broker annual certification of representative's declaration to Supervisory Office" and "Review with Operations Manager any operational issues." The documents had handwritten checkmarks next to each task. Black also produced reports with the title "Office Compliance Inspection" ("Inspection Reports"), which indicated that Black inspected the Four Representatives' offices on the dates shown on the Inspections Calendar, and 29 expense vouchers, which purported to reflect amounts that the firm reimbursed Black for mileage and meals during travel from March 2010 through June 2012.

The vouchers did not include expense receipts or other documentation and did not reflect any connection between a specific office inspection and a reimbursed expense. Instead, the vouchers listed a date, an amount, and a description of either "mileage" or "mileage and meals." Black also produced no emails showing any pre-inspection planning or scheduling of the purported inspections with the Four Representatives. Nor did Black produce any receipts, credit card statements, or bank statements reflecting the expenses Black incurred as part of the purported inspections of the Four Representatives' offices.

In September 2013, pursuant to FINRA Rule 8210, FINRA asked each of the Four Representatives their respective "dates of employment at the firm," whether "Frank Black ever visit[ed] [their] branch office," and whether Southeast "ever conduct[ed] an onsite internal branch review/audit of [their] branch office." Each representative provided a separate written response. Ravella, Rivard, and Minor all stated that neither Black nor anyone else from Southeast had ever visited or performed an inspection of their office and that they had since stopped working for Southeast (Ravella in 2011, and Rivard and Minor in 2012). Marable stated that he did not "recall Frank Black ever visiting [his] office, but if he did[,] it surely was one time," that he did not recall Black or anyone else from Southeast performing any onsite inspection of his office, and that he stopped working for Southeast earlier in 2013. Prior to sending this response, Marable had told FINRA examiner Pamela Arnold in a telephone call that, though he was not certain, an onsite inspection probably had not occurred.

On April 3, 2014, Black provided on-the-record ("OTR") testimony to FINRA. Black testified that he personally inspected the Four Representatives' offices on or about the dates listed on the Inspections Calendar. He also testified that he had the Inspection Reports in front of him during the onsite office inspections and went through the relevant report with each registered representative. Black testified further that he drove to each of the Four Representatives' offices

---

[1] *See* FINRA Rule 8210 (stating that persons subject to FINRA's jurisdiction must provide testimony, information, or documents in connection with FINRA investigations).

**Exhibit 15 - 4**

4

to conduct the inspections—including driving nine hours to Ravella's office in Ohio in October 2010 and eleven hours to Rivard's office in Upstate New York in May 2011.

B.     **Applicants allowed registered representatives to use private email accounts while relying solely on the representatives to send Southeast any business-related correspondence.**

Southeast provided each of its registered representatives with an email account but did not require representatives to use their firm email address for firm business. In 2008, Southeast adopted a policy permitting its registered representatives to use private email accounts when conducting Southeast business as long as they either copied or forwarded the emails from those accounts to Southeast's home office. Southeast's WSPs provided that "[a]ll representatives are required to copy the Main Office with all e-mail communications with clients," that Black was responsible for reviewing correspondence with the public, and that Black was responsible "for establishing written procedures for such review process which are appropriate in light of the structure and the nature and size of [Southeast's] business and operations." Southeast required its registered representatives to certify in writing annually that they were in compliance with the email retention policy.

Our staff's examination of Southeast in 2011 found the firm's policies and procedures regarding email retention deficient. In a March 2012 letter summarizing the results of that examination, our staff warned Applicants that "[r]elying on brokers to provide copies of their own emails to supervisors for review" was not "an effective means to detect . . . misconduct."

During the onsite portion of FINRA's September 2012 examination, FINRA staff asked Applicants to produce emails that had been forwarded or copied to the home office pursuant to the firm's email retention system. From reading the emails Applicants produced, the staff determined that other emails and attachments referenced therein never reached the home office. During the onsite portion of a later FINRA examination in 2014, Black told FINRA staff that the email retention system remained in place and that the requirement that registered representatives certify annually to their compliance with the policy was a sufficient control.

During the 2014 examination, FINRA staff also visited the South Carolina office of Southeast registered representative Richard Sebastian. Sebastian told FINRA staff that he was aware of Southeast's policy that required him to send all business-related emails to the firm's home office and that he fully complied with the policy. But when Sebastian provided FINRA staff with access to his computer and his personal email account, the staff reviewed Sebastian's emails for a one-month period and identified 16 business-related emails that had not been forwarded or copied to the home office. When asked why, Sebastian said it was an oversight.

In an August 2014 letter to Applicants, FINRA notified Southeast that it had violated Rule 17a-4 under the Securities Exchange Act of 1934 by failing "to implement an adequate supervisory system for capturing and preserving incoming and outgoing electronic

**Exhibit 15 - 5**

5

correspondence related to the firm's business at its branch office and non-branch office locations."[2]  The letter also noted Sebastian's failure to retain 16 business-related emails.

In June 2015, Southeast retained a third-party vendor for email archiving and preservation services.  Since that time Southeast has required that, when emailing for business purposes, all of its representatives exclusively use an email account that the vendor captures.

**C.**     **FINRA brought a disciplinary proceeding against Applicants.**

On September 15, 2015, FINRA filed a complaint against Applicants.  The complaint alleged in relevant part that Applicants:  (1) provided to FINRA false OTR testimony and fabricated documents concerning Black's purported inspections of the Four Representatives' offices between October 2010 and July 2012, in violation of FINRA Rules 8210, 4511, and 2010; (2) failed to establish and maintain a reasonable supervisory system and failed to establish, maintain, and enforce WSPs reasonably designed to ensure the retention and review of business-related emails, in violation of NASD Rule 3010 and FINRA Rules 3110 and 2010; and (3) failed to retain business-related emails of Southeast registered representatives, in violation of Exchange Act Section 17(a), Exchange Act Rule 17a-4, and FINRA Rules 4511 and 2010.[3]

Ten witnesses, including Black and the Four Representatives, testified at a hearing in September 2016.  The Four Representatives all testified that they did not know and had never met each other previously.  Each also testified that Black had not inspected the representative's Southeast office between 2010 and 2012 and that nobody else from Southeast had done so either.

During the hearing, Black testified, consistent with his earlier OTR testimony but contrary to the Four Representatives' testimony, that he had personally inspected the Southeast offices of the Four Representatives between 2010 and 2012, including by driving to the Ohio and New York locations that were far from Southeast's home office in Charlotte.  Black also attempted to undermine the credibility of the Four Representatives, testifying that "either we didn't part on good terms or there had been ill feelings before" and that each of the Four Representatives had personal reasons to lie about Black.

In March 2017, the Hearing Panel issued a decision finding that Applicants engaged in the alleged conduct.  The Hearing Panel determined that the Four Representatives "testified truthfully" at the hearing "and were credible on the key subject matter of their testimony:  that [Applicants] did not in fact perform . . . the inspections they claim to have conducted."  The

---

[2]     17 C.F.R. § 240.17a-4.

[3]     The complaint also alleged that Applicants failed to establish and maintain a reasonable supervisory system to ensure that Southeast "branch inspections" occurred and that Applicants provided fabricated documents and false testimony regarding the inspection of another Southeast registered representative's office.  But FINRA's National Adjudicatory Council ("NAC") did not find violations with respect to these charges.  As a result, they are not implicated in this proceeding.  *See Kevin M. Glodek*, Exchange Act Release No. 60937, 2009 WL 3652429, at *6 (Nov. 4, 2009) ("[I]t is the decision of the NAC, not the decision of the Hearing Panel, that is the final action of [FINRA] which is subject to Commission review." (citation omitted)).

Exhibit 15 - 6

6

Hearing Panel based its credibility determination on its "evaluat[ion of] the sworn testimony and the demeanor" of the Four Representatives and its consideration of Black's hearing testimony. The Hearing Panel also considered the Four Representatives' responses to FINRA's Rule 8210 requests for information, Black's investigative testimony, and the lack of convincing documentary proof that the inspections actually occurred. As a result, the Hearing Panel concluded that Applicants had provided false testimony and fabricated documents concerning their purported inspections of the Four Representatives' offices. The Hearing Panel also determined that Applicants failed to establish, maintain, and enforce a reasonable supervisory system and WSPs to prevent the failure to inspect offices and to ensure the retention and review of business-related emails and failed to retain the business-related emails of Southeast registered representatives.

Black and Southeast appealed the Hearing Panel's decision to the NAC. In June 2018, after the parties had submitted their briefs and a NAC subcommittee conducted oral argument, the NAC issued an interim order concerning a "discovery issue." At the September 2016 hearing, FINRA examiner Pamela Arnold had testified that she had taken notes of her first calls with the Four Representatives. Applicants' counsel asked to see the notes, but the hearing officer did not order FINRA Enforcement to produce them. The NAC's interim order then requested that the Hearing Panel direct FINRA Enforcement to produce a copy of the notes. The NAC's order also directed the Hearing Panel to conduct further proceedings to determine whether the notes constituted "written statements" that should have been made available to Applicants during or prior to the 2016 hearing under FINRA Rule 9253(a)(2) and, if so, whether FINRA Enforcement's failure to produce the notes was harmless error under Rule 9253(b).[4]

In June 2018, the Hearing Panel ordered FINRA Enforcement to produce the notes. FINRA Enforcement responded that, despite "exhaustive and independent searches," the notes "could not be located." Instead, it produced, for the first time, emails summarizing the calls that Arnold sent based on her notes. Arnold submitted a declaration stating that she "summarized the information from [her] notes into the emails." Arnold had sent these emails to Ray Palacios, another FINRA examiner who had been on the calls, less than a week after the calls. In response to the June 2018 Hearing Panel order, FINRA Enforcement also produced for the first time a memorandum Palacios prepared about a week after the calls to memorialize them.

---

[4] *See* FINRA Rule 9253(a)(2) (providing that a respondent may "file a motion requesting that [Enforcement] produce for inspection and copying any contemporaneously written statement made by an Interested FINRA Staff member during a routine examination or inspection about the substance of oral statements made by a non-FINRA person when (a) either the Interested FINRA Staff member or non-FINRA person is called as a witness by [FINRA Enforcement], and (b) that portion of the statement for which production is sought directly relates to the Interested FINRA Staff member's testimony or the testimony of the non-FINRA witness"); Rule 9253(b) (providing that, "[i]n the event" Enforcement does not provide "a statement required to be made available for inspection and copying . . . , there shall be no rehearing of a proceeding already heard, or issuance of an amended decision in a proceeding already decided, unless the Respondent establishes that the failure to provide the statement was not harmless error").

Exhibit 15 - 7

7

In July 2018, the parties submitted briefs concerning the notes, emails, and memorandum. In August 2018, the Hearing Panel found that the notes were not written statements pursuant to FINRA Rule 9253(a)(2).  The Hearing Panel also found that, even if the notes could be so considered, Applicants had not demonstrated under FINRA Rule 9253(b)—as was their burden to do—that the failure to produce the notes was more than "harmless error."  It found that the notes contained nothing that would have altered its findings of liability and that "[t]here is no hint that the notes contained any exculpatory" material.  The Hearing Panel restated its earlier finding that the Four Representatives were credible on the "key issue" of whether office inspections had occurred and added that they had "testified without contradiction that they did not know each other" and that "there is no evidence that they coordinated their testimony."

On May 23, 2019, the NAC issued a decision on Applicants' appeal.  The NAC found that Applicants testified falsely and provided FINRA with fabricated documents showing that they had inspected the Four Representatives' offices.  The NAC "defer[red] to the . . . Hearing Panel's determinations that the Four . . . Representatives' testimony was credible and that Black's testimony was not credible."  The NAC also concluded that, even assuming Arnold's notes were "written statements" under FINRA Rule 9253(a)(2), the Hearing Panel was correct in determining that FINRA Enforcement's failure to produce Arnold's notes, and its failure to previously produce Arnold's emails to Palacios and Palacios's memorandum, was harmless error.  The NAC further found that Applicants failed to establish and maintain a reasonable supervisory system, failed to establish, maintain, and enforce reasonably designed WSPs for retaining business-related emails, and failed to retain 16 such emails.[5]

For providing false OTR testimony and fabricated documents, the NAC affirmed the Hearing Panel's sanctions barring Black from associating with any FINRA member and fining Southeast $73,000.  For the supervisory failure, the NAC jointly and severally fined Applicants $73,000—a reduction from the Hearing Panel's $120,000 joint and several fine.  The NAC reduced the fine because, although it sustained the supervisory violations with respect to ensuring the retention of emails, it found that FINRA Enforcement failed to prove that Applicants committed the supervisory violations concerning office inspections found by the hearing panel.  For failing to retain business-related emails, the NAC jointly and severally fined Applicants $500—another reduction from the Hearing Panel's $50,000 joint and several fine.  The NAC explained that "a substantially lower fine" was warranted given the "relatively small number" of emails the firm failed to retain during the one-month period at issue and because

---

[5]    The NAC determined that FINRA Enforcement had not proven that the failure to retain those emails "was not inadvertent."  The NAC therefore reversed the Hearing Panel's finding that the violation was committed willfully (a finding which would have been necessary to support a determination that the firm was statutorily disqualified).

**Exhibit 15 - 8**

8

FINRA Enforcement did not prove that the failure to retain the emails was "not inadvertent."[6] This appeal followed.[7]

## II.        Analysis

We review FINRA disciplinary actions to determine: (1) whether Applicants engaged in the conduct FINRA found; (2) whether that conduct violated the provisions specified in FINRA's determination; and (3) whether those provisions are, and were applied in a manner, consistent with the purposes of the Exchange Act.[8]  We base our findings on an independent review of the record and apply a preponderance of the evidence standard.[9]

### A.        Applicants failed to establish and maintain a reasonable supervisory system and establish, maintain, and enforce reasonably designed WSPs to ensure retention of business-related emails in violation of FINRA Rule 3110 and NASD Rule 3010.

FINRA Rule 3110 requires, and NASD Rule 3010 required,[10] that FINRA member firms establish and maintain a supervisory system and establish, maintain, and enforce WSPs that are reasonably designed to achieve compliance with applicable securities laws and regulations and FINRA rules.[11]  Supervisory procedures must establish mechanisms for ensuring compliance and detecting violations.[12]  The presence of procedures alone is not enough because, without sufficient implementation, guidelines and strictures do not assure compliance.[13]  A violation of

---

[6]        The NAC fined Applicants jointly and severally for the supervisory failure and the failure to retain business-related emails, but it did not impose any fines on Black in light of the bar it imposed on him.

[7]        Concurrent with the appeal, Black moved to stay the bar.  We denied that motion. *Southeast Inv., N.C., Inc.*, Exchange Act Release No. 86097, 2019 WL 2448245 (June 12, 2019).

[8]        15 U.S.C. § 78s(e)(1).

[9]        *See Richard G. Cody*, Exchange Act Release No. 64565, 2011 WL 2098202, at *9 & n.7 (May 27, 2011), *aff'd*, 693 F.3d 251 (1st Cir. 2012).

[10]        FINRA Rule 3110, effective December 1, 2014, superseded NASD Rule 3010.  *See SEC Approves New Supervision Rules*, FINRA Notice 14-10, 2014 WL 1133588 (Mar. 19, 2014). FINRA's complaint related to facts predating and postdating that effective date.

[11]        The alleged supervisory violations related to the period March 2010 to May 2015.  In late 2014, FINRA Rule 3110 superseded NASD Rule 3010 in relevant part.  *Order Granting Approval of a Proposed Rule Change to Adopt Rules Regarding Supervision in the Consolidated FINRA Rulebook*, Exchange Release No. 71179, 2013 WL 6836375, at *1 (Dec. 30, 2013).

[12]        *John A. Chepak*, Exchange Act Release No. 42356, 2000 WL 49226, at *2 (Jan. 24, 2000).

[13]        *KCD Fin., Inc.*, Exchange Act Release No. 80340, 2017 WL 1163328, at *9 (Mar. 29, 2017).

**Exhibit 15 - 9**

9

FINRA Rule 3110 also violates FINRA Rule 2010, which requires that members observe high standards of commercial honor and just and equitable principles of trade.[14]

    **1.    Applicants engaged in the conduct that FINRA found and violated the provisions that FINRA found them to have violated.**

We agree with FINRA that Applicants violated NASD Rule 3010 and FINRA Rules 3110 and 2010 by failing to establish and maintain a reasonable supervisory system, and by failing to establish, maintain, and enforce WSPs to comply with Southeast's email retention requirements under the Exchange Act. Exchange Act Section 17(a)(1) requires broker-dealers to "make and keep for prescribed periods such records . . . and make and disseminate such reports as the Commission, by rule, prescribes."[15] Exchange Act Rule 17a-4 requires broker-dealers to preserve required records for specified periods of time.[16] These recordkeeping requirements cover all business-related correspondence including email[17] and enable the Commission's "[p]rompt access to a broker-dealer's books and records," which "is fundamental to [its] ability to discharge its examination, investigative and law enforcement responsibilities."[18]

Black had ultimate supervisory responsibility over Southeast, all of Southeast's policies and procedures, and all of Southeast's WSPs. Until mid-2015, despite providing all registered representatives with an email account, Applicants allowed their registered representatives working independently in offices across the country to use private (non-Southeast) email for Southeast business and forward or copy to the home office all business-related emails. Southeast did not capture business emails sent or received through private accounts unless the representatives forwarded or copied them to the home office. Because Southeast invited its registered representatives to use email systems over which it had no access or control and retained only those emails that its registered representatives forwarded or copied to the home office without any review or monitoring, its supervisory system for ensuring compliance with those requirements relied entirely on its registered representatives. Southeast did not contemplate *any* audit or other review of compliance with the requirement to forward or copy business emails from private accounts to the home office and relied *exclusively* on the

---

[14]    *Wedbush Sec., Inc.*, Exchange Act Release No. 78568, 2016 WL 4258143, at *10 n.36 (Aug. 12, 2016), *pet. denied*, 719 F. App'x 724 (9th Cir. 2018); *see Edward S. Brokaw*, Exchange Act Release No. 70883, 2013 WL 6044123, at *1 n.2 (Nov. 15, 2003) ("Under the Commission's 'long-standing and judicially-recognized policy,' a violation of another Commission or self-regulatory organization rule or regulation constitutes a violation of the rule prohibiting conduct inconsistent with just and equitable principles of trade.") (quoting *Stephen G. Gluckman,* Exchange Act Release No. 41628, 1999 WL 507864, at *6 (July 20, 1999)).

[15]    15 U.S.C. § 78q(a)(1).

[16]    17 C.F.R. § 240.17a-4.

[17]    *Reporting Requirements for Broker or Dealers Under the Securities Exchange Act of 1934*, Exchange Act Release No. 38245, 1997 WL 46859, at *5 (Feb. 5, 1997).

[18]    *vFinance Inv., Inc.*, Exchange Act Release No. 62448, 2010 WL 2674858, at *8 (July 2, 2010) (citation omitted).

**Exhibit 15 - 10**

10

representations of its registered representative. This policy and procedure was not reasonably designed to ensure compliance with the Exchange Act's requirements.

Southeast representative Sebastian's use of private email to conduct Southeast business and his inadvertent failure to forward or copy Southeast's home office on 16 of his business-related emails illustrates the unreasonable design of this system. This failure resulted from an oversight, not any intentional circumvention of the Southeast email retention system. Yet Southeast did not conduct *any* monitoring for compliance with its requirement that registered representatives forward or copy emails sent or received through private accounts to the home office, even though the policy could fail due to inadvertence or inattention on the part of its registered representatives. That Southeast did not have in place a system to prevent or detect such inadvertent failures establishes that the firm's policy was not reasonable designed to ensure compliance with the Exchange Act.[19]

### 2. Applicants' arguments do not absolve them of liability.

Applicants contend that the system was reasonable based on a FINRA notice that allows a member firm the "flexibility to design supervisory review procedures for correspondence with the public that are appropriate to the individual member's business model."[20] But Southeast's WSPs governing email retention were not reasonable. Nowhere does the regulatory notice that Applicants cite suggest that it was appropriate to allow Applicants' registered representatives to use their personal email addresses to conduct firm business and leave it to the registered representatives to ensure that such emails were retained by the firm.

Applicants also contend that they introduced the system specifically in response to a "suggestion" by a FINRA examiner in 2008. But even accepting that this is true, Commission and FINRA staff in 2012 and 2014, respectively, put Applicants on notice that they believed the email retention system was inadequate.[21] Although Applicants argue that Commission staff's 2012 warning to Applicants was inconsequential because the staff's letter cited a FINRA press release rather than a statute or regulation, the letter explicitly notified Applicants that, in the view of the staff, the firm's email retention system was not reasonable and needed to be revised.[22]

---

[19]  For example, there is no indication that Southeast made any effort to review the employee email messages it did receive to determine whether it was likely that employees were complying with its email retention policy.

[20]  *FINRA Provides Guidance Regarding the Review and Supervision of Electronic Communications*, FINRA Regulatory Notice 07-59, 2007 WL 4351164, at *3 (Dec. 7, 2007).

[21]  *See Clinger & Co.*, Exchange Act Release No. 33375, 1993 WL 538919 (Dec. 23, 1993) (stating that, where prior examination identified deficiencies, firm principal "cannot now reasonably claim that [misconduct] should be excused because he did not receive notice").

[22]  Applicants move to adduce as additional evidence a "Frequently Asked Questions" document posted on FINRA's website after FINRA's decision in this case. According to Applicants, the FAQ document supports Black's assertion that the FINRA press release cited in the 2012 staff letter did not require a change to the firm's email retention system. We deny Applicants' motion because the FAQ is not material to the outcome in this case. *See* Rule of

*(continued . . .)*

**Exhibit 15 - 11**

11

Applicants contend further that the email retention system was reasonable because the firm required Southeast registered representatives to certify annually that they were aware of and in compliance with the email retention system. But "supervisory procedures must establish mechanisms for ensuring compliance and detecting violations."[23] We have "'repeatedly stressed that supervisors cannot rely on the unverified representations of their subordinates.'"[24] Here, self-certification rested with the registered representatives and was not a mechanism that the firm reasonably could use to detect violations and ensure compliance with email retention requirements. And there is no evidence that the firm did anything beyond self-certification to ensure that representatives copied or forwarded emails to the home office.

Finally, Applicants argue that they reasonably responded to regulators' concerns by replacing their email retention system with an automatic email archiving system in June 2015. But the eventual use of an automated email retention system does not negate Applicants' supervisory violations from March 2010 to May 2015.[25]

3.    **The provisions Applicants violated are, and were applied in a manner, consistent with the purposes of the Exchange Act.**

Having found that Applicants engaged in the conduct FINRA found and violated the provisions FINRA found them to have violated, we find further that FINRA Rules 3110 and 2010 and NASD Rule 3010 are, and were applied in a manner, consistent with the purposes of the Exchange Act. Exchange Act Section 15A(b)(6) requires that FINRA design its rules to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and to protect investors and the public interest.[26] Rules 3110 and 3010 are consistent with this mandate because "the responsibility of broker-dealers to supervise their employees is a critical component of the federal regulatory scheme."[27] And Rule 2010 is consistent with the

---

Practice 452, 17 C.F.R. § 201.452 (providing that we "may accept or hear additional evidence . . . as appropriate" and when shown to be "material"). The press release cited in the 2012 staff letter is not the basis for Applicants' liability. FINRA found that Applicants violated NASD and FINRA rules and not any guidance cited in the 2012 letter. The press release simply put Applicants on notice that FINRA staff did not believe their supervisory system was reasonable.

[23]    *Chepak*, 2000 WL 49226, at *2.

[24]    *Stephen J. Horning*, Exchange Act Release No. 56886, 2007 WL 4236161, at *10 (Dec. 3, 2007) (citations omitted), *pet. denied*, 570 F.3d 337 (D.C. Cir. 2009).

[25]    *See Kochcapital, Inc.*, Exchange Act Release No. 31652, 1992 WL 394580, at *4 n.15 (Dec. 23, 1992) (stating that "[p]ost-examination corrective actions do not negate the NASD's findings of violation"). We nevertheless consider this argument, as well as Applicants' contention that they implemented their email system in response to a FINRA examiner's suggestion, in connection with our remedies determination. *See infra* Section III(A)(1).

[26]    15 U.S.C. § 78*o*-3(b)(6); *see also Merrimac Corp. Sec.*, Exchange Act Release No. 10662, 2019 WL 3216542, at *15, *22 (July 17, 2019).

[27]    *Merrimac Corp. Sec.*, 2019 WL 3216542, at *22.

**Exhibit 15 - 12**

12

mandate that FINRA adopt rules to promote just and equitable principles of trade.[28]  Because the evidence establishes that Applicants' supervisory system did not ensure compliance with the requirement that Southeast preserve business-related emails, FINRA applied FINRA Rules 3110 and 2010 and NASD Rule 3010 in a manner consistent with the purposes of the Exchange Act.[29]

**B.      Applicants failed to preserve business-related emails in violation of Exchange Act Section 17(a), Exchange Act Rule 17a-4, and FINRA Rule 4511.**

As discussed above, Exchange Act Section 17(a)(1) and Rule 17a-4 required Southeast to retain business-related emails.[30]  FINRA Rule 4511 requires that member firms make and preserve books and records as Exchange Act Section 17(a) and Rule 17a-4 require.[31]  An individual is liable under FINRA Rules 4511 and 2010 for causing a violation of Rule 4511.[32]

Sebastian used private email to conduct Southeast business, and he failed to forward or copy 16 business-related emails to Southeast's home office.  As a result, Southeast did not retain these emails as required.  Applicants do not dispute that they failed to maintain and preserve the 16 emails.  Although Applicants maintain that it was not their fault Sebastian failed to forward the emails, Black was responsible for the unreasonable supervisory system for email retention and caused Southeast's failure to maintain and preserve the email correspondence.  We agree with FINRA that through this conduct Southeast violated Exchange Act Section 17(a) and Exchange Act Rule 17a-4 and that Southeast and Black violated FINRA Rules 4511 and 2010.[33]

We find that the provisions Applicants violated are, and were applied in a manner, consistent with the purposes of the Exchange Act because those provisions "require[] that member firms conduct their business operations with regularity and that their records accurately

---

[28]      15 U.S.C. § 78*o*-3(b)(6); *Fuad Ahmed*, Exchange Act Release No. 81759, 2017 WL 4335036, at *17 (Sept. 28, 2017).

[29]      *See, e.g., KCD Fin.*, 2017 WL 1163328, at *10 (finding that NASD Rule 3010 is, and was applied in a manner, consistent with the purposes of the Exchange Act).

[30]      *See* 15 U.S.C. § 78q(a)(1); 17 C.F.R. § 240.17a-4.

[31]      FINRA Rule 4511; *see also Meyers Assocs., L.P.*, Exchange Act Release No. 86497, 2019 WL 3387091, at *10 (July 26, 2019) (sustaining FINRA's findings that a member firm violated Exchange Act Section 17(a), Rule 17-a-4, and FINRA Rules 4511 and 2010).

[32]      *See Blair C. Mielke*, Exchange Act Release No. 75981, 2015 WL 5608531, at *15 (Sept. 24, 2015) (finding that an individual caused a firm to maintain inaccurate books and records and that the individual thus violated predecessor rule to Rule 4511); *supra* note 14 (stating that a violation of another Commission or self-regulatory organization rule or regulation constitutes a violation of the rule prohibiting conduct inconsistent with just and equitable principles of trade).

[33]      *See Meyers Assocs.*, 2019 WL 3387091, at *10 (stating that scienter is not required to violate Exchange Act Section 17(a)(1), Rule 17a-4, or FINRA Rule 4511) (citing cases).

**Exhibit 15 - 13**

13

reflect those operations."[34]  Southeast's records did not accurately reflect its operations because the evidence establishes that 16 business-related emails were not properly retained.[35]

**C.  Dismissal for spoliation of evidence is not warranted, but FINRA Enforcement's failure to produce the emails and memorandum memorializing Arnold's initial calls with the Four Representatives prior to the hearing was not harmless error.**

FINRA Rule 8210(a)(1) provides that FINRA has the right to require a member or associated person to provide information orally, in writing, or electronically with respect to any matter involved in an examination or investigation.  The rule "provides a means, in the absence of subpoena power, for [FINRA] to obtain from its members information necessary to conduct investigations."[36]  It is at the "heart of the self-regulatory system for the securities industry" and is an "essential cornerstone of [FINRA's] ability to police the securities markets and should be rigorously enforced."[37]  A member or associated person violates FINRA Rules 8210 and 2010 by providing false or misleading information in response to a Rule 8210 request.[38]

FINRA Rule 4511 provides that members and their associated persons shall "make and preserve books and records as required under the FINRA rules, the Exchange Act and the applicable Exchange Act rules."[39]  FINRA Rule 3110(c) requires that member firms conduct periodic inspections of firm offices and "retain a written record of the date upon which each review and inspection is conducted."[40]  Implicit in the recordkeeping rules is the requirement

---

[34]  *Id.* (alteration in original) (internal quotation marks and citation omitted).

[35]  *See id.* (finding that Exchange Act Section 17(a)(1), Rule 17a-4, and FINRA Rule 4511 are, and were applied in a manner, consistent with the purposes of the Exchange Act because the evidence established that "the Firm's records were not accurate").

[36]  *Howard Brett Berger*, Exchange Act Release No. 58950, 2008 WL 4899010, at *4 (Nov. 14, 2008), *pet. denied*, 347 F. App'x 692 (2d Cir. 2009); *see Charles C. Fawcett, IV*, Exchange Act Release No. 56770, 2007 WL 3306105, at *6 (Nov. 8, 2007) (stating that "[b]ecause NASD lacks subpoena power," Rule 8210 is "vitally important").

[37]  *Jay Alan Ochanpaugh*, Exchange Act Release No. 54363, 2006 WL 2482466, at *5 (Aug. 25, 2006).

[38]  *See, e.g.*, *Geoffrey Ortiz*, Exchange Act Release No. 58416, 2008 WL 3891311, at *7 (Aug. 22, 2008) (finding violation of both the NASD predecessor rule to FINRA Rule 8210 and the predecessor rule to FINRA Rule 2010).

[39]  FINRA Rule 4511(a) (imposing this duty on members); FINRA Rule 0140(a) ("The Rules shall apply to all . . . persons associated with a member.  Persons associated with a member shall have the same duties and obligations as a member under the rules.").

[40]  FINRA Rule 3110(c).

**Exhibit 15 - 14**

14

that records be accurate.[41]  Proof of scienter is not required to establish a violation of FINRA Rule 4511.[42]  A violation of FINRA Rule 4511 is also a violation of FINRA Rule 2010.[43]

FINRA found that Black, and through him Southeast, violated FINRA Rules 8210 and 2010 by testifying falsely at Black's April 2014 OTR interview that he conducted inspections of the Four Representatives' offices between October 2010 and July 2012.  FINRA also found that Black and Southeast violated FINRA Rules 8210, 4511, and 2010 by producing to FINRA fabricated documents falsely showing that Black inspected the Four Representatives' offices. With respect to credibility, the Hearing Panel found that the Four Representatives testified credibly, and consistently with their prior Rule 8210 responses, that neither Black nor anyone else from Southeast inspected their offices.  Conversely, the Hearing Panel found Black's testimony that he inspected the offices not credible and not corroborated by reliable evidence.

Applicants argue that FINRA Enforcement's failure to produce Arnold's notes of the initial calls between FINRA and the Four Representatives before the September 2016 hearing denied Applicants the opportunity to show at the hearing that the Four Representatives were not credible.  They ask us to vacate the findings against them due to spoliation of evidence.  They argue further that the failure to timely produce the emails from Arnold to Palacios and Palacios's memorandum summarizing the calls also prevented them from challenging the Four Representatives' credibility.  Applicants assert that the emails and memorandum show that the Four Representatives testified inconsistently on various matters and contained statements helpful to the Applicants.  Yet Applicants did not have the benefit of the emails and memorandum at the time of the hearing and therefore could not use them as part of their cross-examination. Accordingly, they assert, the failures to produce these documents constituted prejudicial error.

**1.  Dismissal for spoliation of evidence is not warranted.**

Spoliation is "'the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"[44]  A party's "'spoliation of critical evidence may warrant the imposition of sanctions.'"[45]  But a court "must find some degree of fault to impose sanctions" for spoliation of evidence.[46]

---

[41]  *Meyers Assocs.*, 2019 WL 3387091, at *10 & n.77 (collecting citations).

[42]  *Mitchell H. Fillet*, Exchange Act Release No. 75054, 2015 WL 3397780, at *12 (May 27, 2015) (stating that predecessor rule to FINRA Rule 4511 lacks scienter requirement).

[43]  *See, e.g., Meyers Assocs.*, 2019 WL 3387091, at *10 (sustaining FINRA's finding that a recordkeeping violation violated both Rules 4511 and 2010).

[44]  *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (citation omitted).  FINRA's rules do not address spoliation.  But because FINRA must provide "a fair procedure," 15 U.S.C. § 78o-3(b)(8), and because the NAC considered the Applicant's spoliation claims based on federal law, we will address the spoliation claims under federal law here.

[45]  *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (citation omitted).

[46]  *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).

Exhibit 15 - 15

15

Applicants may be able to seek review of the Commission's order in the Fourth Circuit or the D.C. Circuit. In the Fourth Circuit, where Applicants live and work, spoliation "'does not result merely from the negligent loss or destruction of evidence. Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction.'"[47] Although Applicants assert that FINRA acted with "malfeasance" in "either knowingly destroy[ing]/los[ing] the [notes] or negligently los[ing]/destroy[ing] them," Applicants provide no evidence to support this allegation. In a brief to the Hearing Panel on remand, FINRA Enforcement explained that it had Arnold's notes in its possession early in this proceeding; that the relevant FINRA office recently eliminated its on-site file room and moved its files off-site; and that the relocation process may have caused the inadvertent loss of the notes. FINRA's conduct, although perhaps negligent, does not establish culpability under Fourth Circuit law.[48]

In the D.C. Circuit, a sanction for spoliation of evidence may be appropriate based on merely negligent conduct.[49] FINRA Enforcement's explanation for the loss of the notes suggests that it engaged in conduct that could be considered negligent.

Nevertheless, even if FINRA Enforcement acted negligently, the law of neither circuit supports vacating FINRA's findings. In the Fourth Circuit, dismissal is only warranted if "the conduct was 'so egregious as to amount to a forfeiture of [the] claim,' or if the effect of the conduct was so 'prejudicial that it substantially denied the defendant the ability to defend the claim.'"[50] Dismissal is generally not warranted where "evidence is simply transformed from one form to another" and there is no indication that the party's failure to preserve the evidence was intended to deprive its opponent or the trier of fact of any evidence.[51] As noted above, Arnold submitted a declaration stating that she summarized the contents of the notes in her emails, and there is no evidence that the loss of the notes was intended to destroy evidence. The D.C. Circuit has similarly held that dismissal is only appropriate where a party has engaged in "wholesale destruction of primary evidence" or "the destroyed document is dispositive of the case."[52] Here,

---

[47]   *Boone v. Everett*, 751 F. App'x 400, 401-02 (4th Cir. 2019) (quoting *Turner v. United States*, 736 F.3d 274, 281-82 (4th Cir. 2013)); *see also Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) ("Spoliation is not a substantive claim or defense but a 'rule of evidence,' and thus is 'administered at the discretion of the trial court.'") (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)).

[48]   *See United States v. Johnson*, 996 F.3d 200, 217 (4th Cir. 2021) (finding that the mere "'negligent loss or destruction of evidence' is an insufficient basis" for sanctions for spoliation (quoting Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)).

[49]   *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 27 (D.C. Cir. 2013).

[50]   *Loveless v. John Ford, Inc.*, 232 F. App'x 229, 236-37 (4th Cir. 2007) (alteration in original) (quoting *Silvestri*, 271 F.3d at 593).

[51]   *Id.* at 236 (affirming denial of motion for judgment as a matter of law on the basis of spoliation where "the information Brown gathered from Loveless and wrote by hand onto his missing worksheet had been entered into Brown's computer and transformed into a chart").

[52]   *Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1479 (D.C. Cir. 1995).

**Exhibit 15 - 16**

16

FINRA Enforcement's inadvertent, even if negligent, failure to preserve the notes was not so egregious as to justify dismissal. It did not deny Applicants the ability to defend the case or amount to a wholesale destruction of primary or dispositive evidence. FINRA Enforcement preserved the substance of the notes in Arnold's emails and Palacios's memorandum.

Although we find dismissal not warranted, the alleged spoliation may justify an adverse inference against FINRA Enforcement.[53] Should Applicants pursue such a remedy upon the remand to FINRA as discussed below, the Hearing Panel or the NAC may consider the propriety of this sanction. We express no view as to whether the record would support this outcome.

> 2. **We cannot conclude that FINRA Enforcement's untimely production of the notes and memorandum constituted harmless error.**

FINRA Rule 9253 allows a respondent to move for inspection and copying of certain written statements made by FINRA staff "during a routine examination or inspection about the substance of oral statements." If the staff does not provide "a statement required to be made available," rehearing or an amended decision is required if, and only if, the respondent demonstrates that the failure was not harmless error. FINRA concluded that the post-hearing production of the emails and memorandum was harmless error.[54] But FINRA based its findings of violation in significant part on the credibility determinations of the Hearing Panel. And the Applicants were not afforded the opportunity during the hearing to use what they claim are inconsistencies in the emails and memorandum to question witnesses and attempt to impeach their credibility.[55] Accordingly, based on the facts and circumstances of this case, we cannot conclude that the untimely production of the emails and memorandum was harmless error.

We remand this case to FINRA for further proceedings consistent with this opinion. Such proceedings might include, should Applicants request it, further record development through cross-examination of the Four Representatives with the benefit of Arnold's emails and Palacios's memorandum. Again, we express no view of the outcome of these proceedings.

---

[53] *See Grosdidier*, 709 F.3d at 23, 28-29 (where employee had moved for an adverse inference because of destruction of interview notes, finding that employee was "entitled to an adverse inference" but that the denial of the request for such inference was "harmless error"); *see also Loveless*, 232 F. App'x at 237 (stating that circumstances where "evidence is simply transformed from one form to another" "may not even warrant an instruction on an adverse inference, let alone judgment as a matter of law") (citing *S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.*, 695 F.2d 253, 259 (7th Cir. 1982) (finding that destruction of handwritten notes used to draft memorandum did not support adverse inference where witness did not preserve notes because they were illegible and all necessary information was in memorandum)).

[54] FINRA does not argue before us that the emails and memorandum were not subject to Rule 9253.

[55] *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (stating that exculpatory evidence includes evidence that may be used for purposes of impeaching a witness's credibility).

**Exhibit 15 - 17**

17

### III.    Sanctions

Exchange Act Section 19(e)(2) directs us to sustain FINRA's sanctions unless we find, with due regard for the public interest and the protection of investors, that the sanctions are excessive or oppressive or impose an unnecessary or inappropriate burden on competition.[56]  In doing so, we must consider any aggravating or mitigating factors.[57]  We also consider whether the sanctions are remedial or impermissibly punitive.[58]  Although we are not bound by FINRA's Sanction Guidelines, we use them as a benchmark in conducting our review.[59]

### A.    The fines FINRA imposed are not excessive or oppressive.

#### 1.    The fine for the supervisory violations is not excessive or oppressive.

For the supervisory violation, FINRA fined Applicants $73,000 jointly and severally. For a failure to supervise, the Guidelines recommend a fine between $5,000 and $73,000, and "[c]onsider[ation] [of] independent (rather than joint and several) monetary sanctions for [the] firm and responsible individual(s)."[60]  They also recommend suspending the responsible individual in all supervisory capacities for up to 30 business days and limiting activities of the appropriate branch office or department for up to 30 business days.[61]  For egregious cases, they

---

[56]    15 U.S.C. § 78s(e)(2).  Applicants do not allege, nor does the record show, that the sanctions imposed create an undue burden on competition.  Because we remand for further proceedings in connection with the untimely production of Arnold's emails and Palacios's memorandum, we do not reach the propriety of the bar FINRA imposed for Applicants' false testimony and fabrication of documents in violations of FINRA Rules 8210, 4511, and 2010.

[57]    *Saad v. SEC*, 718 F.3d 904, 906 (D.C. Cir. 2013) (citing *PAZ Sec., Inc. v. SEC*, 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

[58]    *McCarthy v. SEC*, 406 F.3d 179, 188-191 (2d Cir. 2005) (recognizing that the Commission may expel a broker from the securities industry "not as a penalty but as a means of protecting investors"); *see also Springsteen-Abbott v. SEC*, 989 F.3d 4, 9 (D.C. Cir. 2021) ("FINRA is generally prohibited from imposing 'excessive or oppressive' penalties, which we have held limits FINRA to remedial sanctions") (citing 15 U.S.C. § 78s(e)(2)).

[59]    *See, e.g., John Joseph Plunkett*, Exchange Act Release No. 69766, 2013 WL 2898033, at *11 (June 14, 2013).

[60]    FINRA Sanction Guidelines at 104 (May 2018), www.finra.org/sites/default/files/2018_Sanctions_Guidelines.pdf (last visited Dec. 5, 2023).  The current version of the Guidelines, introduced in October 2021, contemplates a fine of up to $77,000.  *See* FINRA Sanction Guidelines at 104 (Oct. 2021), www.finra.org/sites/default/files/Sanctions_Guidelines.pdf (last visited Dec. 5, 2023).  We rely, as did the NAC, on the version of the Guidelines in effect at the time of the NAC's decision.

[61]    *Id.*

**Exhibit 15 - 18**

18

recommend a longer limitation on activities of the branch office or department or suspending the firm for up to 30 business days and suspending or barring the responsible individual.[62]

We sustain the fine at the top of the Guidelines' recommended range. As the NAC found, several factors aggravate Applicants' supervisory failures. Applicants failed to establish and maintain a reasonable supervisory system for ensuring email retention over the course of several years.[63] We agree with the NAC that it is "especially troubling" that although both our staff and FINRA informed Southeast in 2012 and 2014 that its email retention system was inadequate, Applicants ignored those warnings and instead continued to use what the NAC characterized as an "honor system."[64]

We also sustain the determination to impose the fine jointly and severally. Despite the Guidelines, the Hearing Panel found that, because "Black is the owner and President of Southeast," it was "appropriately remedial to fine [Applicants] jointly and severally for their supervision violations." Although the NAC did not expressly address this issue, it did not disagree with the Hearing Panel's basis for imposing the joint and several fine. Nor do we, because Southeast's wrongdoing occurred through Black while Black owned Southeast.[65]

Applicants claim that certain factors mitigate their misconduct and support a lesser fine. We do not find any mitigating factors that suggest the fine should have been lower. For example, we do not find mitigating Applicants' claim that in 2008 FINRA staff allegedly recommended the supervisory system that Southeast employed. In 2012 and 2014, our staff and FINRA staff specifically warned Applicants about deficiencies with the email supervisory system Southeast employed at the time. Applicants cannot and do not claim that guidance from 2008, even if FINRA staff actually gave it, somehow superseded these specific warnings. Nor do we find mitigating the fact that Southeast now employs an automated email preservation system and has abandoned the prior deficient system. The Guidelines include as a "principal consideration" in determining sanctions whether "corrective measures" were employed "*prior to detection or intervention . . . by a regulator.*"[66] Here, Applicants took no corrective action until

---

[62]     *Id.*

[63]     *See id.* at 7 (Principal Considerations in Determining Sanctions, No. 9).

[64]     *See id.* at 8 (Principal Considerations in Determining Sanctions, No. 14 (discussing whether the respondent engaged in the misconduct despite prior warnings from FINRA or another regulator that the conduct violated the securities laws or FINRA rules).

[65]     *See Donald L. Koch*, Exchange Act Release No. 72179, 2014 WL 1998524, at *24 n.246 (May 16, 2014) ("Because Koch is the sole owner and principal of KAM, and it is through Koch's conduct that KAM's violations occurred, joint and several liability [for the civil penalty] is appropriate"), *pet. granted in part on other grounds*, 793 F.3d 147 (D.C. Cir. 2015).

[66]     Guidelines at 7 (emphasis added).

**Exhibit 15 - 19**

19

after FINRA began its investigation. Corrective measures taken *after* the commencement of an enforcement action typically do not constitute mitigating circumstances.[67]

Applicants also argue that mitigation exists because, according to them, the supervisory system was in fact "reasonably designed to monitor and review correspondence" and Sebastian "simply evaded it." But, as discussed above, the system unreasonably left Southeast with no control over retention of certain emails and no way to detect non-retention. Nor does the record show that Sebastian purposefully or maliciously "evaded" a well-designed system, and Applicants proffer no evidence to the contrary; rather, Sebastian's oversight in failing to forward the 16 emails to the Southeast home office highlights the flaws in the system's design. In any event, we agree with the NAC that the "overarching concern with [Southeast's] supervisory system is not related to what may have motivated any failure to retain specific emails. Rather, it is that the entire email retention system was not reasonably designed to comply with the email retention requirement."

Applicants contend further that Black has a history of helping law enforcement identify wrongdoing in the securities industry and that this history is mitigating. But a "self-professed willingness to expose misconduct by others does not . . . mitigate the seriousness" of violations.[68] Finally, despite Applicants' assertion to the contrary, a lack of customer harm is not mitigating.[69]

## 2. The fine for the failure to retain emails is not excessive or oppressive.

For the failure to retain the 16 emails, FINRA fined Applicants $500 jointly and severally. For recordkeeping violations, the Guidelines recommend a fine of $1,000 to $15,000; where "aggravating factors predominate," a fine of $10,000 to $146,000; and where "significant aggravating factors predominate," a higher fine.[70] They recommend suspending the responsible individual for 10 business days to three months and "[w]here aggravating factors predominate" a

---

[67]    *See Wedbush Sec.*, 2016 WL 4258143, at *15 (stating that "the Firm's purported corrective actions" did not mitigate sanctions "because some were taken only after regulators notified them of the reporting failures"); *see also Meyers Assocs.*, 2019 WL 3387091, at *17 ("Applicants also contend that they took corrective action by 'successfully uncover[ing] the 49 alleged unreported customer complaints . . . and report[ing] each one . . . .' This is not mitigating because Applicants did this after 'detection and intervention' by FINRA.") (citing Guidelines at 7 and *Wedbush Sec.*, 2016 WL 4258143, at *13).

[68]    *David Kristian Evansen*, Exchange Act Release No. 75531, 2015 WL 4518588, at *14 (July 27, 2015).

[69]    *See, e.g.*, *KCD Fin.*, 2017 WL 1163328, at *12 (finding the lack of customer harm not to be mitigating) (citing *Howard Braff*, Exchange Act Release No. 66467, 2012 WL 601003, at *7 (Feb. 24, 2012)).

[70]    Guidelines at 29.

**Exhibit 15 - 20**

20

longer suspension or a bar.[71]  Applicants do not challenge the amount of the $500 fine, which falls below the Guidelines' recommended range.  We sustain it as not excessive or oppressive.

**B.      The fines FINRA imposed are not impermissibly punitive.**

As discussed above, FINRA may impose sanctions for remedial but not punitive purposes, and Applicants challenge the fines FINRA imposed as punitive.  But as the D.C. Circuit recently made clear in rejecting a challenge to a sanction FINRA imposed, FINRA's sanctions are remedial when they are imposed "as a means of protecting investors."[72]  And the "public interest requires that appropriate sanctions be imposed to secure compliance with the rules, regulations, and policies of both [FINRA] and [the] SEC."[73]  In particular, where FINRA finds that a firm has violated the securities laws, the imposition of fines allows FINRA "to deter that firm—and the responsible firm personnel—from committing future violations without imposing sanctions unnecessary to remedy the misconduct."[74]  That is what happened here.

Here, the fines FINRA imposed on Applicants for their supervisory and email retention failures are remedial because they will impress upon Applicants and other firms and their associated persons the importance of complying with these requirements in the future and thereby help to secure that compliance.[75]  The fines are not punitive because they will have this effect without resort to a more serious sanction, such as a suspension or expulsion of Southeast or bar of Black from FINRA membership that would be unnecessary in light of the nature of Applicants' misconduct.[76]  In this way, FINRA was able to "tailor a remedy" that was appropriate for the violation.[77]  In these circumstances, the fines are remedial and not punitive.

---

[71]      *Id.*

[72]      *Saad v. SEC*, 980 F.3d 103, 109 (D.C. Cir. 2020) (quotation marks and citation omitted).

[73]      *Lek Sec. Corp.*, Exchange Act Release No. 82981, 2018 WL 1602630, at *12 n.47 (Apr. 2, 2018) (cleaned up) (quoting *Sisung Sec. Corp.*, Exchange Act Release No. 56741, 2007 WL 3254804, at *8 (Nov. 5, 2007) (quoting *Boruski v. SEC*, 289 F.2d 738, 740 (2d Cir. 1961))).

[74]      *Id.* (alteration in original) (quoting *Sisung*, 2007 WL 3254804, at *8).

[75]      *See id.* (stating that "[t]his fine will protect investors by impressing on LSC the importance of complying with FINRA rules in the future"); *see also PAZ Secs*, 494 F.3d at 1066 (stating that "'general deterrence . . . may be considered as part of the overall remedial inquiry'") (quoting *McCarthy*, 406 F.3d at 189).

[76]      *See Lek Sec. Corp*., 2018 WL 1602630, at *12 n.47  ("That the deterrent effect of this fine serves the public interest and the protection of investors, without resort to a more serious sanction such as suspension or expulsion of LSC from FINRA membership, bolsters our conclusion that this fine is neither excessive nor oppressive").

[77]      *Sisung*, 2007 WL 3254804, at *8 (noting that "the ability to impose fines for securities law violations 'greatly increase[s] deterrence, while also providing . . . the flexibility to tailor a remedy to the gravity of a violation'") (alteration in original) (citation omitted); *cf. Report of the Senate Committee on Banking, Housing, and Urban Affairs on the Securities Law Enforcement Remedies Act of 1990*, S. Rep. No. 101-337, at 9-10 (1990) (stating that "civil money penalties

*(continued . . .)*

**Exhibit 15 - 21**

21

Applicants contend that the fine FINRA imposed for the failure to have a reasonable supervisory system to retain emails is "not remedial" because the firm now employs an automated email preservation system and has abandoned the prior deficient system. But Applicants' supervisory obligations are ongoing with respect to email preservation specifically and the firm's responsibilities generally. In light of the fact that the firm twice ignored warnings that one of its supervisory systems was inadequate, we think the fine is an appropriate remedial measure to secure Applicants' compliance with its supervisory responsibilities in the future. Applicants also contend that the fine is punitive because there was no harm to customers as a result of the unreasonable supervisory system. But a sanction FINRA imposes may be remedial "even if it is aimed at protecting the public and not at correcting the effects of wrongdoing."[78]

An appropriate order will issue.[79]

By the Commission (Chair GENSLER and Commissioners PEIRCE, CRENSHAW, UYEDA and LIZÁRRAGA).

Vanessa A. Countryman
Secretary

---

will enhance the remedial nature of the SEC's enforcement program" by "giv[ing] the SEC and the courts the flexibility to better tailor a remedy to the facts and circumstances of the violation," that penalties may be imposed when other remedies "may be too severe or, alternatively, too weak," and that "penalties . . . serve to increase deterrence and help maintain public confidence in the integrity of the markets" as well as "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws").

[78] *Saad*, 980 F.3d at 107.

[79] We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

Exhibit 15 - 22

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 99118 / December 7, 2023

Admin. Proc. File No. 3-19185

---

SOUTHEAST INVESTMENTS, N.C., INC.

and

FRANK HARMON BLACK

For Review of Disciplinary Action Taken by

FINRA

---

ORDER SUSTAINING IN PART AND REMANDING IN PART DISCIPLINARY ACTION TAKEN BY FINRA

On the basis of the Commission's opinion issued this day, it is

ORDERED that FINRA's findings of violations and sanctions imposed against Southeast Investments, N.C., Inc. and Frank Harmon Black for an ineffective system for the retention of business-related emails and failure to preserve 16 emails in the firm's records are sustained; and it is further

ORDERED that the findings of violations and sanctions imposed against Southeast Investments, N.C., Inc. and Frank Harmon Black for testifying falsely and producing to FINRA fabricated documents are set aside and that the proceeding is remanded to FINRA for further consideration consistent with this opinion.

By the Commission.

Vanessa A. Countryman
Secretary